**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MARLENE CARIDE, as Commissioner of the New Jersey Department of Banking and Insurance, and THE NEW JERSEY DEPARTMENT OF BANKING AND INSURANCE, | Civil Action No. 22-01329 (FLW) |
| Plaintiffs, | **OPINION** |
| v. | |
| JESSICA K. ALTMAN, as Rehabilitator of Senior Health Insurance Company of Pennsylvania and her successors in office, in their capacity as Rehabilitator of SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, and PATRICK H. CANTILO, as Special Deputy as Rehabilitator of Senior Health Insurance Company of Pennsylvania and his successors in office, in their capacity as Rehabilitator of SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, | |
| Defendants. | |

**WOLFSON, Chief Judge:**

      Presently before the Court is Plaintiffs Commissioner Marlene Caride and the New Jersey

Department of Banking and Insurance's ("DOBI") (collectively, "Plaintiffs") Motion to Remand

this matter to New Jersey Superior Court. Plaintiffs initiated this action in state court seeking,

among other things, a declaratory judgment that Defendants Jessica K. Altman, in her role as

Rehabilitator of Senior Health Insurance Company of Pennsylvania ("SHIP"), and Patrick H.

Cantilo (collectively, "Defendants"), in his role as Special Deputy Rehabilitator of SHIP, lack

authority under New Jersey insurance law to unilaterally change health insurance premium rates of New Jersey members without Plaintiffs' permission.  Defendants then removed the action on the basis of this Court's federal question jurisdiction and diversity jurisdiction.  Plaintiffs, in the present Motion, argue that this Court lacks subject matter jurisdiction, because the Complaint did not raise a federal question and the parties are not diverse, since the State of New Jersey is the real party in interest.  For the foregoing reasons, Plaintiffs' Motion to Remand is **GRANTED**.

## I.   <u>FACTUAL BACKGROUND</u>[1]

Plaintiff Marlene Caride is the Commissioner of the DOBI, a department within the executive branch of the New Jersey state government, charged by the Legislature with the exclusive authority to regulate the insurance business in the State.  Compl. ¶¶ 6-7.  Defendant Commissioner Altman is the former Commissioner of Insurance for the Commonwealth of Pennsylvania[2] and Rehabilitator for SHIP.  *Id*. ¶ 8.  Defendant Patrick Cantilo is the Special Deputy Rehabilitator for SHIP.[3]  *Id*. ¶ 10.

SHIP, a life and health insurance company domiciled in Pennsylvania, administers a closed block of long-term care insurance policies.  *Id*. ¶ 11.  Prior to 2020, SHIP was licensed to provide long-term care insurance policies for senior citizens in 46 states, including New Jersey, with the

---

[1] The facts are recounted from the Complaint and taken as true for the purposes of this Motion.

[2] Michael Humphreys is the current Acting Pennsylvania Commissioner of Insurance.  Compl. ¶ 9.

[3] Under Pennsylvania Law, the Insurance Commissioner is delegated authority to "exercise[e] a direct role in the rehabilitation of insolvent insurers."  *Foster v. Mut. Fire, Marine and Inland Ins. Co.*, 531 Pa. 598, 608 (1992).  Under 40 P.S. § 221.15(a), the Commissioner may petition a Pennsylvania state court to authorize him or her to rehabilitate an insurer.  Once the rehabilitation has been ordered by the court, the Commissioner, as Rehabilitator, "may take such action as [he or she] deem necessary or expedient to correct the condition or conditions which constituted the grounds for the order of the court to rehabilitate the insurer."  40 P.S. § 221.16(b).  In addition, the Rehabilitator has the power to retain a special deputy, who "shall have all the powers of the rehabilitator."  40 P.S. § 221.16(a).

average age of their policyholders being 89 years old. *Id*. ¶ 20. However, by 2020, SHIP's financial condition had significantly worsened, and it had assets of $1.4 billion and liabilities of $2.6 billion, which created a funding gap of $1.2 billion. *Id*. ¶ 21. For this reason, on January 23, 2020, pursuant to Pennsylvania statute, Defendant Altman filed an application in Pennsylvania Commonwealth Court requesting an order that SHIP be placed in Rehabilitation. *Id*. ¶ 22. The application explained that, based on SHIP's most recent annual financial statements, SHIP was statutorily insolvent and that its total adjusted capital was substantially below mandatory levels. *Id*. ¶ 23. Six days later, the Commonwealth Court entered an Order of Rehabilitation, and appointed Altman as Rehabilitator and Cantilo as Special Deputy Rehabilitator. *Id*. ¶ 24.

On April 22, 2020, the Rehabilitator filed the first proposed rehabilitation plan, and over the next few months, twice amended that plan. *Id*. ¶ 25. Eventually, on August 24, 2021, the Commonwealth Court entered a Memorandum Opinion and Order approving a final rehabilitation plan (the "Plan").[4] *Id*. ¶ 26. This Plan proposes reducing SHIP's funding gap by adjusting the rates of premium paying policyholders. *Id*. ¶ 44. Specifically, through a multi-phase procedure, policyholders will be required to elect a new long-term care plan from a variety of presented options, each of which would alter current benefits and premium levels. *Id*. ¶¶ 47-49.

The Rehabilitator provided state insurance regulators, including New Jersey, with the option to either "opt in" or "opt out" of the Plan. *Id*. ¶ 51. By letter to Commissioner Caride dated September 30, 2021, the Rehabilitator explained the consequences of opting in or out:

> A state which opts out is one that elects to make its own determinations as to modifications of premium rates. If a state opts in, the state agrees that the Rehabilitator may make rate increases and benefit changes to that state's policyholders (pursuant to the Plan). If a state opts out, then the Rehabilitator will

---

[4] As of the parties' briefing, state insurance regulators from Maine, Massachusetts, and Washington are challenging the Plan in Pennsylvania state court. *Id*. ¶¶ 27-31.

file a premium rate application for all policies below the If Knew premium.[5] If a state denies the requested premium or approves only a lower premium, the Rehabilitator will then unilaterally adjust the benefits to the level that is determined to be appropriate.

*Id*.  In a November 9, 2021 response, Commissioner Caride rejected the options presented by the Rehabilitator, and disagreed that the Rehabilitator had the unilateral right to alter benefits or premium rates in New Jersey, because rate regulation is reserved to the insurance commissioner of each state.  *Id*. ¶ 52.

Notwithstanding the rejection, in January 2022, the Rehabilitator mailed "Coverage Election Packages" to New Jersey SHIP policyholders, which presented the new policy options, and gave policyholders until March 15, 2022, to elect a new policy.  *Id*. ¶ 54.  Furthermore, on February 2, 2022, the Pennsylvania Commonwealth Court approved SHIP's use of nationwide-premium rates, which included rates for New Jersey policyholders.  *Id*. ¶ 55.

On March 9, 2022, Plaintiffs commenced the present action in Superior Court of New Jersey, Chancery Division, Mercer County, seeking (1) a declaratory judgment under the Declaratory Judgments Act, N.J.S.A. 2A:16-51, *et seq*., that any order entered by the Pennsylvania Commonwealth Court granting Defendants the authority to impose unilateral premium changes and policy modifications to SHIP's New Jersey policyholders is void, that any unilateral premium changes and policy modifications pursuant to the Plan are void, and that any action by Defendants to implement the Plan is void, and (2) injunctive relief preventing Defendants from implementing the Plan in New Jersey.  *Id*. ¶¶ 59-80.

---

[5] The "If Knew" premium rate is "the rate that, if charged from inception, would have produced an underwriting loss ratio of 60% for each policy form."  Show Cause Br. at 11, ECF 1-1, Ex. 1, P. 1.  According to the Plan, policyholders "whose premiums are below the 'If Knew' premium level will be required to elect among options to modify premiums and/or benefits."  *Id*.

On March 11, 2022, Defendants removed the action to this Court.  ECF No. 1.[6]  Defendants then filed an amended notice of removal on March 31, 2022.  ECF No. 6 ("Amended Notice of Removal").  On April 8, 2022, Plaintiffs filed the present Motion to Remand.

## II.   **STANDARD OF REVIEW**

Removal of a suit from state to federal court is proper only if the federal court to which the action is removed would have had original jurisdiction over the matter.  *Entrekin v. Fisher Scientific, Inc.*, 146 F. Supp. 2d 594, 603-04 (D.N.J. 2001) (citing 28 U.S.C. § 1441(a)-(b)).  Indeed, the statute provides in relevant part:

> Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

28 U.S.C. § 1441(a).  Furthermore, remand is governed by 28 U.S.C. § 1447(c), which states that whenever subject-matter jurisdiction is absent, the district court must remand the case to the state court upon either motion or *sua sponte*. 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").  To maintain subject matter jurisdiction over a lawsuit, the Court must either have diversity jurisdiction, 28 U.S.C. § 1332, or federal question jurisdiction, 28 U.S.C. § 1331.

Importantly, the "defendant bears the burden of showing the appropriateness of removal," and "[t]he Court must also strictly construe the removal statutes against removal and resolve any doubts in favor of remand."  *Entrekin*, 146 F. Supp. 2d at 604.

---

[6] Defendants have also filed a Motion to Dismiss the Complaint.  ECF No. 3.  Because the Court lacks subject matter jurisdiction over the dispute, I cannot address the merits of on that Motion.

## III.   <u>DISCUSSION</u>

Plaintiffs argue that this action must be remanded, because this Court lacks subject matter jurisdiction.  First, Plaintiffs assert that there is no diversity jurisdiction, as Plaintiffs are alter egos of New Jersey, and therefore, cannot be considered "citizens" for purposes of diversity jurisdiction. Moreover, Plaintiffs contend that Defendants have failed to specifically allege that the amount in controversy is over $75,000.  Second, Plaintiffs maintain that their Complaint does not raise a federal question, since their claims rely exclusively on New Jersey law.  I agree.

### A.  Diversity Jurisdiction

Diversity jurisdiction "requires complete diversity of the parties; that is, no plaintiff can be a citizen of the same state as any of the defendants." *Grand Union Supermarkets of V.I., Inc. v. H.E. Lockhart Mgmt., Inc.*, 316 F.3d 408, 410 (3d Cir. 2003). In any case resting on diversity jurisdiction, the Court must determine for itself whether every defendant is completely diverse from the plaintiff. *See Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 394 (3d Cir. 2016) (quoting *Grand Union Supermarkets of the V.I., Inc. v. H.E. Lockhart Mgmt., Inc.*, 316 F.3d 408, 410 (3d Cir. 2003)).  Importantly, "[t]he burden of persuasion for establishing diversity jurisdiction, of course, remains on the party asserting it." *Hertz Corp. v. Friend*, 559 U.S. 77, 96 (2010).

As such, here, the burden is on Defendants, since they asserted in their Amended Notice of Removal that there is complete diversity among the parties.  Am. Not. of Rem. ¶¶ 13-19, ECF No. 6.  In that connection, Defendants argue that Plaintiffs are not alter egos of New Jersey, because any recovery by Plaintiffs will have no impact on the New Jersey treasury, Plaintiffs'

status under state law appears to be neutral, and Plaintiffs have sufficient autonomy and control over their affairs such that they are independent from New Jersey.[7]

28 U.S.C. § 1332(a) provides, in relevant part, that federal courts have jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between (1) citizens of different States . . . ."  However, "[t]here is no statute which authorizes the removal of a suit between a state and citizens on the ground of citizenship, for a state cannot, in the nature of things, be a citizen of any state." *Stone v. State of South Carolina*, 117 U.S. 430, 433 (1886).  Thus, a suit between a state and a citizen of another state is not a suit between citizens of different states for purposes of diversity jurisdiction and federal courts have no jurisdiction over such matters unless they "arise[] under the Constitution, laws or treaties of the United States." *State Highway Comm'n of Wyoming v. Utah Constr. Co.*, 278 U.S. 194, 200 (1929).

"To establish whether an entity is a state's alter ego for diversity purposes, the Third Circuit employs the same test used to evaluate an entity's entitlement to Eleventh Amendment immunity." *Rowan Univ. v. Factory Mut. Ins. Co.*, No. 21-08992, 2021 WL 4947374, at *4 (D.N.J. Oct. 25, 2021) (citing *Doolin v. Kasin*, 424 Fed. App'x 106, 109 (3d Cir. 2011)).  The Third Circuit formulated the Eleventh Amendment entity test, also known as the "arm of the state" test, in *Fitchik v. New Jersey Transit Rail Operations*, 873 F.2d 655, 659 (3d Cir. 1989).  Under *Fitchik*, a court must consider "(1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has." *Karns v.*

---

[7] Notably, a "suit against an individual in his or her official capacity is no different from a suit against that individual's office." *Christy v. Pennsylvania Tpk. Comm'n*, 54 F.3d 1140, 1143 n.3 (3d Cir. 1995).  Therefore, Defendants' assertion that Commissioner Caride is an arm of the state is, essentially, an assertion against DOBI.

*Shanahan*, 879 F.3d 504, 513 (3d Cir. 2018) (internal citation omitted).  In particular, these factors are afforded equal weight.  *Id*. at 513-15.

> ### i.    Funding

As to the first factor, courts must look to "[w]hether the money that would pay the judgment would come from the state." *Karns*, 879 F.3d at 515 (quoting *Fitchik*, 873 F.2d at 659).  Three considerations are relevant: "whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts." *Id*. (quoting *Fitchik*, 873 F.2d at 659).  Since *Fitchik*, the Third Circuit has clarified that the "crux" of this inquiry is "not whether the state will be the principal source of any funding, but rather whether the state is 'legally responsible for the payment of [the] judgment.'" *Id*. (quoting *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 233 (3d Cir. 2006)).

However, as a matter of logic, this factor is not helpful where, as is the case here, the government entity is a plaintiff.  *Rowan Univ.*, 2021 WL 4947374, at *4 (agreeing with the parties "that the first *Fitchik* factor is less directly relevant . . . where the alleged 'arm of the state,' Rowan, is the plaintiff rather than the defendant."); *New Jersey Dept. of Enviro. Prot. v. Nestle USA, Inc.*, No. 06-4025, 2007 WL 703539, at *2 n.2 ("[T]he first factor is not helpful in this analysis because it is more suited to litigation in which an agency is a defendant in an action.").  As such, the Court finds that this factor is neutral.

> ### ii.    Status under State Law

The second *Fitchik* factor focuses on "the status of the agency under state law." 873 F.2d at 659.  Relevant considerations include "'how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and

8

whether it is immune from state taxation.'" *Karns*, 879 F.3d at 516 (quoting *Fitchik*, 873 F.2d at 659). Courts may also consider "the entity's authority to exercise the power of eminent domain, application of state administrative procedure and civil service laws to the entity, the entity's ability to enter contracts and make purchases on its own behalf, and whether the entity owns its own real estate." *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 91 (3d Cir. 2016).

Here, there is considerable evidence that New Jersey law considers DOBI an arm of the state. Defendants solely argue that DOBI is not an arm of the state, because Plaintiffs are able to institute lawsuits in their own name. *See* N.J.S.A. 17:1-15(g) (stating that Commissioner shall "[i]nstitute or cause to be instituted the legal proceedings or processes necessary to enforce properly and give effect to any of the commissioner's powers or duties."). However, the ability to "sue [or] be sued . . . is not dispositive." *Karns*, 879 F.3d at 517 (citing *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999)). And in that connection, when considering the remaining evidence, I am satisfied that the second factor weighs in favor of finding that DOBI is an arm of the state.

As an initial matter, DOBI was created to "regulate and oversee the operations of the insurance industry[,]" and as such, New Jersey endowed it with the "statutory obligation to protect the interests of New Jersey's insurance customers." *Clark v. Prudential Ins. Co. of Am.*, 736 F. Supp. 2d 902, 916 (D.N.J. 2010) (quotations and citation omitted). In that regard, DOBI is not a separately incorporated entity, but rather, is "constituted as a principal department in the executive branch of the State Government[.]" N.J.S.A. 17:1-1. When DOBI collects fees for services performed by DOBI, including application fees, license fees, assessments, and charges for investigations and examinations, DOBI is required to "make returns to the Director of the Division of Budget and Accounting of all fees and moneys collected by [DOBI], and pay the sum so

collected into the State Treasury." N.J.S.A. 17:1-8. As a principal department, DOBI derives its power to promulgate rules from the New Jersey Administrative Procedures Act, and it must effectuate the state's legislative insurance goals. N.J.S.A. 17:1-8.1. Furthermore, Commissioner Caride "serve[s] at the pleasure of the Governor during the Governor's term of office," and is directly "appointed by the Governor, with advice and consent of the Senate[.]" N.J.S.A. 17:1-2. Subordinate to the Governor, Commissioner Caride is also required to draft "a report each year to the Governor and to the legislature of [DOBI's] operations for the preceding fiscal year, and render such other reports as the Governor shall from time to time request[.]" N.J.S.A. 17:1-15(h).

Weighing these facts supports the conclusion that the Commissioner and DOBI act at the behest of the Governor, and that they must act in accordance with the power bestowed upon them by the Legislature. As such, the second factor weighs heavily in favor of finding that DOBI is an arm of the state.

### iii.   Autonomy

The final *Fitchik* factor concerns the degree of "autonomy from state control" that the entity retains. *Maliandi*, 845 F.3d at 83. Courts must analyze "the entity's governing structure and the oversight and control exerted by a State's governor and legislature." *Id.* at 96.

This factor, too, weighs in favor of DOBI being an arm of the state. Indeed, the State wields substantial control over DOBI's functions. As noted by Plaintiffs, it is a "long-settled and well-established" public policy in New Jersey that "the insurance industry is strongly affected with a public interest and therefore properly subject to comprehensive regulation to protect the public welfare." *R.J. Gaydos 21 Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 168 N.J. 255, 280 (2001) (internal quotations and citation omitted). For this reason, New Jersey established the Department of Banking and Insurance to regulate and oversee those industries for the public welfare, and thus,

the State grants various authorities and powers to the DOBI through appropriate legislation.  *See* N.J.S.A. 17:1-1; *Clark*, 736 F. Supp. 2d at 916.  As part of that statutory scheme, Commissioner Caride has been given authority to "[p]erform, exercise and discharge the functions, powers, and duties of [DOBI] through those divisions established by law or as the commissioner deems necessary," including through, as noted *supra*, instituting legal proceedings to enforce her powers and duties.  N.J.S.A. 17:1-15(c); *see In re Virtua-West Jersey Hosp. Vorhees for a Certificate of Need*, 194 N.J. 413, 422-23 (2008) ("[T]he breadth of an agency's authority encompasses all express and implied powers necessary to fulfill the legislative scheme that the agency has been entrusted to administer.").  However, importantly, this authority, along with any other authority granted to Commissioner Caride by statute, is constrained by the Governor's appointment power, as Commissioner Caride "serve[s] at the pleasure of the Governor during the Governor's term of office," and is directly "appointed by the Governor, with advice and consent of the Senate[.]" N.J.S.A. 17:1-2.  "[T]herefore, she presumably can be removed from office with or without cause." *Savadjian v. Caride*, No. 18-16381, 2019 WL 6975102, at *5 (D.N.J. Dec. 20, 2019), *aff'd*, 827 Fed. App'x 199 (3d Cir. 2020) (noting that Commissioner Caride is not insulated from political pressure because she can be removed without cause).  Furthermore, the Commissioner is required to send annual reports to the Governor and Legislature on DOBI's operations, as well as any other report the Governor and Legislature request.  N.J.S.A. 17:1-15(h).

Defendants argue that Plaintiffs exercise independent authority, because Commissioner Caride has the power to appoint deputy commissioners and assistant commissioners, as well as the authority to organize the DOBI administrative structure.  But such functions are typical of an executive agency head.  *See, e.g.*, Powers and Duties of Commissioner of Health, ("[The Commissioner] shall, subject to the provisions of Title 11 of the Revised Statutes relating to Civil

Service, appoint directors of the divisions and such other personnel as he may consider necessary for the efficient performance of the work of the department."); Duties of Commissioner of Department of Labor, N.J.S.A. 34:1-5 ("All powers and duties vested in and devolved upon the commissioner . . . shall be exercised and performed by him in person or under his personal supervision and control, through and by any bureau or representative thereof duly authorized by the commissioner for that purpose."). Having such powers, by themselves, do not elevate DOBI's status to an independent entity beyond the reach of the State. Rather, as set forth *supra*, DOBI and its Commissioner are beholden to the State. Defendants overlook the fact that Commissioner Caride serves at the pleasure of the Governor, and thus, may be removed should the Governor disapprove of her performance, or for any other reason. While Defendants further assert that the DOBI retains financial independence through a "special purpose funding source," they fail to explain how this type of funding source makes DOBI any more independent than other executive departments. *See* N.J.S.A. 17:1C-19, 17:1C-33. Indeed, in creating a special purpose funding source for DOBI, the Legislature declared that because of DOBI's duty to "maintain an adequate level of financial oversight and perform all lawful duties in this regard, it is necessary to establish a special purpose funding mechanism for the department's special needs." N.J.S.A. 17:1C-19(a)(2). For this reason, the Legislature decided that the "actual incurred expenses of [DOBI] for all services related to [DOBI's] financial regulation, supervision and monitoring of insurers . . . [would be] apportioned among insurers and health maintenance organizations doing business in [New Jersey]." N.J.S.A. 17:1C-19(b). As such, this funding mechanism was not created to establish the independence of DOBI, but rather, it was "a clear indication of the [State's] commitment . . . to the special needs of the department relative to its administrative activities related to the financial regulation, supervision, and monitoring of insurers and health maintenance

organizations."  N.J.S.A. 17:1C-19(a)(3).  While such a mechanism places DOBI outside of the traditional legislative appropriations process, as an executive branch department, the Legislature still retains power to alter DOBI's funding methods should it so choose, and furthermore, modify its regulatory authority.

In sum, it is clear that the New Jersey legislature and Government retain control over Plaintiffs, such that the third factor of autonomy weighs in favor of finding that DOBI is an arm of the state.  In totality, examining all three factors, I find that DOBI operates as an arm of the state, and therefore, Plaintiffs are alter egos of the State of New Jersey for purposes of determining diversity jurisdiction.  Because states cannot be citizens in diversity jurisdiction, there is no complete diversity between the parties.  *See State Highway Comm'n of Wyoming*, 278 U.S. at 200.[8]

While this would normally be the end of the Court's inquiry, Defendants alternatively assert that if Plaintiffs are determined to be alter egos of New Jersey, then by similar logic, Commissioner Humphreys, as Pennsylvania Insurance Commissioner, must be an alter ego of Pennsylvania, as well.  Furthermore, Defendants reason that if Commissioner Humphreys is, in fact, acting as an arm of Pennsylvania, this matter would thus be between two states, and the Supreme Court would have original jurisdiction over this matter.  *See Kansas v. Nebraska*, 574 U.S. 445, 453 (2015) ("The Constitution gives this Court original jurisdiction to hear suits between States.").

---

[8] Even if Plaintiffs were not alter egos of New Jersey, the Court notes that it is unclear that Defendants have demonstrated that the amount in controversy is over $75,000.  Defendants' Amended Notice of Removal bases the amount in controversy on the fact that the 592 New Jersey SHIP policyholders "could pay thousands of dollars in premiums each year and have coverage exceeding $100,000."  Am. Not. of Rem. ¶ 27.  Given that Defendants' only evidence appears to be a sample policy election form sent to policyholders, Defendants' claim in this regard is speculative, and not supported by cogent evidence.  However, because the parties are not diverse, the Court need not determine whether the amount in controversy requirement is met.

Although Defendants acknowledge that this suit is being brought against Commissioner Humphrey in his capacity as Rehabilitator, Defendants argue that his role as Rehabilitator cannot be separated from his role as Insurance Commissioner, because Pennsylvania law gives the Rehabilitator power to operate for the public welfare, similar to the Insurance Commissioner.  In that connection, Defendants contend that, for this reason, the Court should conduct the arm of the state test for Commissioner Humphrey as if he is defending this suit in his role as Insurance Commissioner.

However, Defendants are plainly incorrect that Commissioner Humphrey, here, cannot be separated from his role as the Insurance Commissioner.  Pennsylvania courts, in fact, do separate the two roles, and apply the "separate capacities doctrine" to situations where the Insurance Commissioner acts as party to a lawsuit in his or her capacity as Rehabilitator.  This doctrine states, as a general matter, that "a governmental entity, . . . when acting in one capacity, is treated as a separate entity when acting in another capacity." *Koken v. One Beacon Ins. Co.*, 911 A.2d 1021, 1028 (Pa. Commw. Ct. 2006) ("Our courts have consistently found that pre-liquidation, pre-rehabilitation, regulatory conduct of the Insurance Commissioner cannot be raised against a Statutory Liquidator enforcing those rights.").  In this circumstance, Pennsylvania law recognizes, under the separate capacities doctrine, that the Rehabilitator "steps into the shoes of the insurer and recoups its assets" to protect the right of the insurer's creditors, policyholders and shareholders. *Id*. at 1029.  Therefore, any "actions commenced by the [Rehabilitator] are on behalf of the insurance company and its creditors and policyholders," and the Rehabilitator's "claims are not premised upon any rights asserted by the Insurance Department or the Insurance Commissioner." *Foster v. Monsour Med. Found.*, 667 A.2d 18, 20 (Pa. Commw. Ct. 1995).  Given this doctrine, as it pertains to this lawsuit, Commissioner Humphrey is acting in a separate capacity

as a court-appointed Rehabilitator, rather than performing the regulatory functions granted to him by the State of Pennsylvania as Insurance Commissioner.  He, therefore, he cannot be an alter ego of Pennsylvania.  Contrary to Defendants' contention, this lawsuit is not between two states, and the Court does not have diversity jurisdiction over this matter.

### B.  Federal Question Jurisdiction

Defendants' Amended Notice of Removal asserts that Plaintiffs' Complaint invokes federal question jurisdiction based on a single mention of the McCarran-Ferguson Act ("MFA"), 15 U.S.C. § 6701, *et seq*.  Am. Not. of Rem. ¶ 36.  Specifically, the Complaint states, in one instance, that "under the McCarren-Ferguson Act, the [New Jersey Long-Term Care Insurance Act], and the Police Powers of New Jersey, New Jersey has the exclusive authority and right to govern the business of insurance in New Jersey."  Compl. ¶ 65.  In Defendants' view, because of this reference to the MFA, Plaintiffs' entitlement to relief is based on their federally protected authority to govern the business of insurance within New Jersey.  Plaintiffs maintain that their claims exclusively arise under the New Jersey Long-Term Care Insurance Act, and no interpretation of, or reference to, the MFA is required.  I agree with Plaintiffs.

To find federal question jurisdiction, the federal question must be raised in the complaint, as "a suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution." *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152 (1908).  "The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  Courts apply the well-pleaded complaint rule "because plaintiffs are the 'masters of their claims[,]'" and if

15

"plaintiffs say their claims are state-law claims, we almost always credit that . . . . After all, [plaintiffs] choose to sue, so they choose why." *City of Hoboken v. Chevron Corp.*, No. 22-1096, 2022 WL 3440653, at *2 (3d Cir. Aug. 17, 2022) (quoting *Caterpillar*, 482 U.S. at 392) (internal citation omitted); *see Green Tree Servicing LLC v. Dillard*, 88 F. Supp. 3d 399, 401 (D.N.J. 2015) ("Because the plaintiff acts as 'master of the claim,' a court looks to the face of a complaint in accordance with the 'well-pleaded complaint' rule in order to determine whether the action rests upon a federal claim."). In that connection, "federal-question jurisdiction is invoked by and large by plaintiffs pleading a cause of action created by federal law[.]" *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). Furthermore, "cases should be remanded when federal law is merely referenced or mentioned." *JVC Americas Corp. v. CSX Intermodal, Inc.*, 292 F. Supp. 2d 586, 592 (D.N.J. 2003) (internal quotations omitted).

However, "in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable*, 545 U.S. at 312 (citation omitted). The Supreme Court has reaffirmed that the "'special and small category' of cases" in which federal question jurisdiction will predominate over state-law claims that implicate significant federal issues, is "slim." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (quoting *Empire Healthchoice Assurance v. McVeigh*, 547 U.S. 677, 699 (2006)).

The Supreme Court has set forth the necessary circumstances in which a federal question can predominate over a state law claim:

> [F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress. Where all four of these requirements are met ... jurisdiction is proper because there is a serious federal interest in claiming the advantages thought to be inherent in a federal forum, which can be vindicated without disrupting Congress's intended division of labor between state and federal courts.

16

*Id*. at 258 (internal quotations omitted) (citing *Grable*, 545 U.S. at 313-14).   These elements "capture[] the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law[.]"   *Grable*, 545 U.S. at 312.

Here, Plaintiffs' claims for declaratory and injunctive relief plainly do not arise under the MFA.   As an initial matter, Defendant's argument is unpersuasive, because it is based on the Complaint's single passing reference to the MFA.   *See JVC*, 292 F. Supp. at 592 ("[C]ases should be remanded when federal law is merely referenced or mentioned.").   Furthermore, Defendants have failed to present a single analogous case where a party relies on the MFA for federal question jurisdiction.   Nor can they, since the MFA does not create any federal cause of action for a state seeking to halt another sister state from intruding into its insurance regulatory schemes.   Rather, the MFA is modeled as a "reverse pre-empt[ion]" statute, passed to quell *federal* intrusion into state insurance regulation, after the Supreme Court's decision in *United States v. South-Eastern Underwriters, Assn.*, 322 U.S. 533 (1944), which found for the first time that an insurance company conducting a substantial part of its business across state lines was engaged in interstate commerce subject to federal regulation, and specifically in *South-Eastern*, antitrust regulation. *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 499 (1993).   Because of this new "threat to state power to tax and regulate the insurance industry . . ., Congress moved quickly to [pass the MFA to] restore the supremacy of the States in the realm of insurance regulation."   *Id*. at 499-500.   For this reason, the MFA's operative provision states that: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."   15 U.S.C. § 1012(b).   As such, it is clear that in passing the MFA, Congress did not intend to create

17

a federal remedy for states facing intrusion into their insurance scheme from sister states or private

entities, but rather, Congress meant to ensure that the *federal government* did not interfere with a

state's ability to regulate insurance within its borders.  *See Grp. Life & Health Ins. Co. v. Royal*

*Drug Co.*, 440 U.S. 205, 219 n.18 (1979) ("The McCarran-Ferguson Act operates to assure that

the States are free to regulate insurance companies without fear of Commerce Clause attack.").

In addition to the lack of a private right of action under the MFA, it is clear that Plaintiffs'

claims do not raise a federal question, because they do not "require the Court to interpret and apply

the terms of a federal statute."  *Kindred Hospitals East, LLC v. Local 464A United Food and*

*Commercial Workers Union Welfare Serv. Benefit Fund*, No. 21-10659, 2021 WL 4452495, at *5

(D.N.J. Sept. 29, 2021).  Rather, Plaintiffs can be afforded their requested relief based exclusively

on the Long-Term Care Insurance Act, N.J.S.A. 17B:27E-10, 11.  These provisions state:

> Every long term care insurance policy or contract, including any application,
> certificate, rider, or endorsement to be issued or delivered, shall be filed with the
> Commissioner for prior approval.

N.J.S.A. 17B:27E-10.

> An insurer providing long-term care insurance issued on an individual basis in New
> Jersey shall file, for the commissioner's approval, its rates, rating schedule, and
> supporting documentation demonstrating that it is in compliance with the
> applicable loss ratio standards of this State. All filings of rates, rating schedules,
> and supporting documentation shall demonstrate that the benefits are reasonable in
> relation to the premium charged and that the rates are not excessive, inadequate, or
> unfairly discriminatory.

N.J.S.A. 17B:27E-11.  Pursuant to these provisions, Plaintiffs request a declaratory judgment that

Defendants failed to comply with the requirement that all rate changes must be filed with

Commissioner Caride, and in that connection, seek to enjoin Defendants from unilaterally

implementing rate changes, among other things.  The MFA merely provides that the "business of

insurance . . . shall be subject to the laws of the several states," 15 U.S.C. § 1012(a), and delegates

the power to regulate insurance to the states within their borders.  As such, the present matter does not require the Court to interpret or reference the MFA.  Rather, to grant relief here, a court must answer the narrow question of whether Defendants have run afoul of the Long-Term Care Insurance Act's plain terms, a purely state-related issue.  For this reason, Plaintiffs' Complaint does not raise a federal question.

Finally, this case does not fall into the "'special and small category' of cases" in which federal question jurisdiction will predominate over state-law claims" because, here, a federal question is not necessarily raised.  *See Gunn*, 568 U.S. at 258 ("[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.").  "For a federal issue to be necessarily raised, 'vindication of a right under state law [must] necessarily turn[] on some construction of federal law.'"  *Manning v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 772 F.3d 158, 163 (3d Cir. 2014) (quoting *Franchise Tax Bd. of State of Cal. V. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 9 (1983)).  For example, *Grable* presented one of these "rare instances."  *Id*.  In *Grable*, Grable sued under state law to quiet title, however, five years prior to the suit, the Internal Revenue Service had seized Grable's land to satisfy a tax deficiency.  *Id*.  Grable claimed that he had not received sufficient notice of the seizure under federal law, and therefore, the Supreme Court held that because "'whether Grable was given notice within the meaning of the federal statute [was] . . . an *essential element* of its quiet title claim,' . . . the issue of what notice was required under federal law was necessarily raised."  *Id*. (quoting *Grable*, 545 U.S. at 315).

Here, unlike in *Grable*, Plaintiffs' causes of action do not turn on construction of federal law, nor is federal law an essential element of their claims.  Rather, Plaintiffs can be provided relief

solely by considering whether Defendants violated the terms of the Long-Term Care Insurance Act.  Indeed, the MFA does not contain any specific insurance regulations or guidance, such as how states must handle rate modifications.  Nor does this matter raise questions under the MFA's reverse pre-emption provision.  Therefore, this case does not necessarily raise a federal issue.  *See Hoboken*, 2022 WL 3440653, at *8 ("The Constitution restricts us to resolving claims that are about federal law or that Congress has expressly authorized us to hear.  These claims check neither box.  So we cannot hear them.").  "Because [I] conclude that no federal issue has been necessarily raised, [I] need not decide whether the other three *Grable* requirements are met."  *Manning*, 772 F.3d at 163.

As such, Defendant has failed to demonstrate that this Court has either diversity or federal question jurisdiction over this dispute.  For this reason, the Court lacks subject matter jurisdiction, and must remand the matter to the Superior Court of New Jersey.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs' Motion to Remand is **GRANTED**, and this matter is remanded to the Superior Court of New Jersey, Mercer County, Chancery Division.  An appropriate order shall follow.


Date: August 25, 2022                                    <u>/s/ Freda L. Wolfson</u>
                                                                        Freda L. Wolfson
                                                                        U.S. Chief District Judge